**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



BATH & BODY WORKS BRAND
MANAGEMENT, INC.,

          Plaintiff and Counter-Defendant,

          -against-

SUMMIT ENTERTAINMENT, LLC,

          Defendant and Counter-Claimant.

<u>MEMORANDUM DECISION</u>
<u>AND ORDER</u>

11 Civ. 1594 (GBD) (JLC)

GEORGE B. DANIELS, United States District Judge:

Plaintiff Bath & Body Works Brand Management, Inc., ("BBW") brought this

declaratory judgment action against Summit Entertainment, LLC ("Summit"), on March 8, 2011,

to establish its right to use the marks Twilight Woods and Twilight Crush for personal care

products.[1]  ECF No. 1.  BBW sells personal care products through its retail stores and website,

BBW SUF ¶¶ 1-3.[2]  Summit is the producer and distributor of the motion picture *Twilight* and its

four sequels.  BBW SUF ¶ 9.  Summit filed a six count counterclaim, seeking judgment in its

favor on all five of the grounds that BBW sought to establish, as well as seeking cancellation of

the trademark registration of Twilight Woods and Twilight Crush.  ECF No. 24.  In its

counterclaims, Summit charged BBW with willful false designation of origin, trademark

infringement, trademark dilution, and trade dress infringement.  <u>Id.</u> ¶¶ 27, 35, 42-43, 50.  Summit

---

[1] Specifically, BBW sought a declaratory judgment seeking to establish (1) non-infringement of the trademark for
Twilight Woods, (2) that it had not engaged in unfair competition, (3) that it had not falsely designated the origin of
its goods, (4) non-infringement of trade dress, and (5) that its activities did not constitute dilution of Summit's mark.
[2] BBW SUF refers to BBW's Local Rule 56.1 Statement of Undisputed Fact that it filed in conjunction with its
motion for summary judgment.  ECF No. 116.  Summit CSUF refers to Summit's counterstatement of material fact
it filed in response to BBW's SUF.  ECF No. 135.  BBW CSUF refers to BBW's counterstatement of material fact
that it filed in response to Summit's CSUF.  ECF No. 150.

subsequently amended its counterclaims three times.[3]  On March 1, 2013, BBW filed the instant

motion for summary judgment to dismiss Summit's counterclaims and grant BBW declaratory

relief.  ECF No. 114.  BBW's motion for summary judgment is DENIED.

## Background[4]

Twilight Woods is a line of personal care products that is part of BBW's Signature

Collection, a group of products that features over two dozen fragrances.  BBW SUF ¶¶ 115-16.

In August 2008, BBW had no woods-scented product and began developing such a fragrance for

launch in Fall 2009.  Id. ¶¶ 145-46.  In April 2009, and after considering and testing other names,

Steve Lange, BBW's Vice President of Brand Development, testified that he, Sheila Patel,

Director of Category Merchandising and David Skeens, a member of BBW's brand team, came

up with the name Twilight Woods during a series of brainstorm sessions that primarily occurred

via text message.  Summit CSUF ¶ 322.  That same month, Ms. Patel conducted an informal test

of the names "Twilight Woods" and "Tuscan Woods" with consumers at a store in New York

City.  BBW SUF ¶ 155.  Consumers mispronounced the name "Tuscan Woods" as "Tuscon

Woods," as in Tucson, Arizona, and BBW selected the name "Twilight Woods" for its product

line.  Id. ¶ 156-57.

Summit finances, produces, and distributes motion pictures.  Summit CSUF ¶ 224.

Summit optioned from author Stephenie Meyer the right to produce film adaptions of her

*Twilight* series of books, and Summit released the first movie, *Twilight*, on November 21, 2008.

---

[3] Summit amended its counterclaims on October 11, 2011, to moot BBW's motion to dismiss Summit's claim of
trade dress infringement.  ECF No. 41.  It next amended them on July 6, 2012, to allege new grounds for
cancellation of BBW's Twilight Crush mark.  ECF No. 77.  Its third amendment occurred on November 28, 2012,
when it added additional grounds for cancellation of the Twilight mark that BBW had acquired from Coty, a third
party company, during the course of this litigation.  ECF No. 87.  Coty had obtained a registration for the Twilight
mark for use with personal care products from the Patent and Trademark Office ("PTO") with a priority date of June
18, 2008.  Id. ¶ 35.  This was more than a year prior to Summit's priority date in this category of June 25, 2009.
BBW SUF ¶¶ 22-23.  The new counterclaims sought to cancel Coty's registration on several grounds, including
invalid assignment to BBW and fraud on the PTO.  ECF No. 87, ¶¶ 79-89.
[4] The following facts are undisputed, except where indicated.

Id. ¶¶ 225-26.  Summit released the second installment, *The Twilight Saga: New Moon*, on November 20, 2009.  Id. ¶ 227.  The *Twilight* movie series has enjoyed widespread popularity and considerable commercial success.  In total, *Twilight* grossed over $397 million at the box office, *New Moon* grossed over $700 million, and each of *Twilight's* subsequent movies grossed over $690 million.  Id. ¶¶ 252-56.

Summit owns 40 U.S. trademark registrations for "Twilight," including the *Twilight* Motion Pictures trademark (collectively "the Twilight Marks").  Id. ¶ 234.  Summit's U.S. trademark registration for Twilight is in standard character format for the production and distribution of motion pictures, id. ¶ 235, and Summit first used the mark on April 18, 2008.  Id. ¶ 236.  Summit's Twilight trademark registrations include registrations for clothing, candles, and purses and other bags.  Id. ¶¶ 237-242.  Summit also has trademarks in Nox Twilight for nail polish in Class 3, with a filing date of November 24, 2010, and a registration date of July 17, 2012, and Luna Twilight for cosmetics in Class 3, with a filing date of May 28, 2009, and a March 8, 2011 registration date.  Id. ¶¶ 243-244.  Summit seeks trademark protection for all of its trademarks that include the term Twilight.  See Third Amended Countercl. ¶ 9.

### Legal Standard for Summary Judgment

Summary judgment is permissible "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "An issue of fact is genuine 'if the evidence is such that a jury could return a verdict for the nonmoving party.'"  Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)).  A fact is material when "it 'might affect the outcome of the suit under the governing law.'"  Id. (quoting Anderson, 477 U.S. at 248).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists.  See Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002).  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  To do so, it "'must do more than simply show that there is some metaphysical doubt as to the material facts,'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation." Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 428 (2d Cir. 2002) (citations and quotations omitted). Rather, the non-moving party must produce admissible evidence that supports its pleadings.  See First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289-90 (1968).  In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Anderson, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor.  See Niagara Mohawk, 315 F.3d at 175.  Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  Summary judgment is therefore inappropriate "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." Marvel, 310 F.3d at 286 (citations and quotations omitted).

### Trademark Infringement Claims

Counts 1 and 2 of Summit's third amended counterclaims assert claims for trademark infringement and false designation of origin under the Lanham Act, 15 U.S.C. §§ 1114, 1125.[5]

---

[5] The same standard that is applied to Summit's Lanham Act claims also applies to Summit's statutory and common law unfair competition claim in Count Six.  See Compl. at ¶¶ 91-93; see also Info. Superhighway, Inc. v. Talk Am.,

The Lanham Act protects the first user of a trademark by barring a later user from employing a similar mark that can confuse purchasers and besmirch the reputation of the first user. See Streetwise Maps, Inc. v. Vandam, Inc., 159 F.3d 739, 742 (2d Cir. 1998). In order to prevail on the Lanham Act claims of trademark infringement and false designation of origin, a plaintiff must show (1) that it has a valid mark that is entitled to protection and (2) that defendant's actions are likely to cause confusion between plaintiff's and defendant's services. See Virgin Enter., Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003) (citations and quotations omitted).

1. Validity of the Marks

As noted, the first prong of the test for trademark infringement requires that the Twilight marks be entitled to protection. BBW does not challenge that Summit's Twilight marks are valid and entitled to protection, but claims instead that BBW has priority for the trademark Twilight for cosmetics and fragrances, based on the assignment from Coty on August 31, 2012. BBW SUF ¶ 18. However, Summit's trademark claims are not limited to its cosmetics products, Luna Twilight and Twilight Venom, and despite BBW's claim that they have priority as to Twilight for cosmetics and fragrances, nowhere does BBW dispute that any of Summit's other Twilight marks are valid marks entitled to protection.[6] Summit's federal registrations are prima facie evidence of its ownership of the Twilight marks, and BBW has not attempted to rebut the strong presumption of the validity of these marks. See Aluminum Fabricating Co. v. Season-All

---

Inc., 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005) (granting summary judgment on Lanham Act and unfair competition claims because standard for both claims is the same); FragranceNet.com, Inc. v. FragranceX.com, 493 F. Supp. 2d 545, 548 (E.D.N.Y. 2007) ("[T]he elements necessary to prevail on common law cause of action for trademark infringement and unfair competition mirror Lanham Act claims.").

[6] Furthermore, BBW has failed to establish that there is no genuine issue of material fact as to whether Coty's Twilight mark has priority over Summit's Twilight mark. Summit used the Twilight mark in commerce at least as early as April 18, 2008, for the production and distribution of Twilight Motion Pictures and at least as early as May 1, 2008, for clothing and merchandise related to Twilight. See, Summit CSUF ¶¶ 236, 24. Both of these dates are prior to BBW's alleged priority date of June 18, 2008, based on the assignment from Coty. Accordingly, BBW has not established as a matter of law that it has priority over Summit with respect to the Twilight mark.

Window Corp., 259 F.2d 314, 316 (2d Cir. 1958) (federal registration provides "a strong presumption of validity so that the party claiming invalidity has the burden of proof and in order to prevail it must put something more onto the scales than the registrant."). The outcome of Summit's trademark infringement claim thus turns on the likelihood-of-confusion inquiry.[7]

2. Likelihood of Confusion

Likelihood of confusion is a "key element" that a plaintiff must prove in order to prevail in a trademark infringement suit. Gruner + Jahr v. Meredith Corp., 991 F.2d 1072, 1077 (2d Cir. 1993). To demonstrate likelihood of confusion, Summit must show that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." Id. The possibility of confusion is insufficient to meet this standard; rather, consumer confusion must be probable. See Estee Lauder Inc. v. the Gap, Inc., 108 F.3d 1503, 1510 (2d Cir. 1997). "A probability of confusion may be found when a large number of purchasers likely will be confused as to the source of the goods in question." Nora Beverages, Inc. v. the Perrier Grp. of America, 269 F.3d 114, 121 (2d Cir. 2001).

The Second Circuit routinely weighs eight non-exclusive factors, also known as the Polaroid factors, to determine likelihood of confusion. See Virgin Enter., 335 F.3d at 147. These factors are: (1) the strength of the plaintiff's mark; (2) the similarity of the defendant's

---

[7] BBW also seeks dismissal of Summit's counterclaims based on the doctrine of laches. See BBW Mem. at 19. BBW argues that Summit became aware of BBW's infringing activity when BBW launched the Twilight Woods line of products in the fall of 2009, but did not oppose BBW's use of the mark until November 1, 2010. See Summit CSUF ¶ 411. A party may establish laches by showing that (1) the plaintiff had knowledge of the infringing activities; (2) the plaintiff inexcusably delayed in taking action and; (3) the defendant would be prejudiced if the plaintiff belatedly asserted its rights to the mark. See Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp., 964 F. Supp. 733, 751 (S.D.N.Y. 1997). BBW has offered no evidence to demonstrate it was prejudiced by Summit's delay. Absent any such evidence, BBW cannot establish that had Summit objected to BBW's activity earlier, there would have been any reduction in alleged prejudice. See Conopco, 95 F.3d at 192 ("prejudice ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed.") (quotations and citations omitted). Accordingly, BBW's laches defense is insufficient to warrant summary judgment.

mark to plaintiff's; (3) the proximity of the products sold under defendant's mark to plaintiff's products; (4) where the products are different, the likelihood that plaintiff will "bridge the gap" by selling products being sold by defendant; (5) the existence of actual confusion among consumers; (6) whether defendant acted in bad faith in adopting the mark; (7) the quality of the defendant's products; and (8) the sophistication of the consumers. See Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961). This Court accordingly takes up each of these factors in turn.

The first factor, the strength of the mark, measures a mark's "tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." The Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 960 (2d Cir. 1996). When determining a mark's strength, courts consider both the mark's inherent distinctiveness, based on the characteristics of the mark itself, and its acquired distinctiveness, based on associations the mark has gained through use in commerce. See Streetwise Maps, 159 F.3d at 743-44.

As to inherent distinctiveness, "courts classify a mark in one of four categories in increasing order of inherent distinctiveness: generic, descriptive, suggestive, and arbitrary." Id. at 744. The word "twilight" has no intrinsic relationship to motion pictures or merchandise related thereto, including cosmetics, and is thus an arbitrary mark. See Virgin Enter., 335 F.3d at 148 (finding that the VIRGIN mark was highly distinctive because it has "no intrinsic relationship whatsoever" to selling consumer electronic goods).

With respect to acquired distinctiveness, BBW argues that Summit is not entitled to the presumption of an exclusive right to use its registered Twilight marks in the cosmetic industry because Summit's registration for those marks is in other industries and fields. Specifically, BBW contends that Summit has offered no evidence that its Twilight marks had acquired

distinctiveness for personal care products before BBW launched the Twilight Woods line. See, BBW Mem. at 25-26 ("Summit has offered no evidence that consumers came to associate its alleged common law mark TWILIGHT for cosmetics with Summit prior to BBW launching its product (or ever)") (citing The Trustees of Columbia University in the City of New York, 964 F. Supp. at 744 (finding non-infringement where mark, while strong in the field of education services, was weak in the field of the alleged infringer's use – healthcare)).

Summit argues, however, that its Twilight mark had acquired such significant distinctiveness that consumers would recognize it from prior use in connection with the Twilight Motion Pictures franchise. Summit emphasizes that the *Twilight* Motion Pictures are one of the most successful entertainment franchises in history, and that at the time BBW launched its Twilight Woods line of products, Summit's Twilight marks were remarkably famous. Summit SUF ¶¶ 252-80. Summit presents additional evidence that it has sent out hundreds of cease and desist communications and initiated TTAB proceedings to police the unauthorized use and registration of the *Twilight* mark. See Opp'n at 31, citing The Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C., 182 F.3d 133, 139 (2d Cir. 1999) ("the successful policing of a mark adds to its strength to the extent that it presents weakening of the mark's distinctiveness in the relevant market.").

While Summit has not presented any evidence that its Twilight marks are strong in the field of personal care products, Summit has presented significant evidence that its Twilight Motion Pictures marks – which Summit seeks to protect in this action – are very strong. Viewing the evidence in the light most favorable to Summit, as this Court must on BBW's motion, BBW has failed to show that this factor weighs in its favor as a matter of law.

The second Polaroid factor concerns the similarity of BBW's and Summit's marks. Similarity is a holistic consideration that turns on the marks' sight, sound, and overall

commercial impression under the totality of the circumstances.  See Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 538 (2d Cir. 2005).  Moreover, "[s]ide by side comparison is not the appropriate test."  Clinique Lab., Inc. v. Dep Corp., 945 F. Supp. 547, 552 (S.D.N.Y. 1996).  Rather, "the correct test is whether a consumer who is somewhat familiar with the plaintiff's mark would likely be confused when presented with defendant's mark alone."  Id.

Here, Summit contends that the marks and their attendant trade dress are extremely similar.  Both marks begin with the word "Twilight," which is the dominant portion of BBW's mark.  See Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, 1998 U.S. Dist. LEXIS 6806, *25 (S.D.N.Y. 1998) (general rule is that a subsequent user may not avoid a likelihood of confusion by adding descriptive matter to another's arbitrary mark).  Summit further argues that the label design and overall commercial impression of the two brands are very similar, and that this is no accident – the first Twilight Woods line used a color palette resembling that used by Summit in its *New Moon* promotions, and in 2011 BBW altered its Twilight Woods packaging to include more purples, peaches, and pinks which matched the color palette used by Summit to promote *Breaking Dawn- Part I*.  See Summit SUF ¶¶ 325, 370; Opp'n at 15.  Summit also argues that both its own and BBW's marks are presented in all lower case letters, and that BBW's packaging and advertising of the Twilight Woods line "is evocative of the forest locations and romantic themes that serve as the backdrop for *Twilight* and *New Moon*."  See Opp'n at 15.

BBW, by contrast, argues that it depicts the name Twilight Woods on some of its products in both cursive and script fonts (unlike Summit's) and BBW's products bear the Bath & Body Works and Signature Collection house marks.  Summit SUF ¶¶ 102-103, 106-107; see also Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 46 (2d Cir. 2000) (a "well-known house brand…significantly reduces, if not altogether eliminates, the likelihood" of consumer confusion "as to the source of the parties' products"); W.W.W. Pharm. Co. v. Gillette Co, 984 F.2d 567,

573 (2d Cir. 1993) (company name used with mark lessened confusion).  BBW also emphasizes

that its marks include the distinguishing words "woods" or "crush," which often are depicted

more prominently than "twilight."  BBW SUF ¶¶ 105-106.

Although the Court sees merits in both parties' arguments, this is not a case of a Lanham

Act Plaintiff seizing upon a single element shared between otherwise dissimilar marks.  Cf.

Universal City Studios, Inc. v. Nintendo Co., Ltd., 746 F.2d 112, 117 (2d Cir. 1984).  Rather,

Summit's analysis serves to illustrate a pattern of resemblance between the contested marks and

their attendant trade dress.  Viewing the evidence in Summit's favor, the Court finds that a

reasonable jury could conclude that the marks and their trade dress are similar.

The third and fourth Polaroid factors are the proximity and the possibility of the senior

user "bridging the gap" into the junior user's market.  These two factors "focus on the degree to

which the products currently compete with each other or are likely to compete with each other in

the future."  Medici Classics Prod, LLC v. Medici Grp., 683 F. Supp. 2d 304, 311-12 (S.D.N.Y.

2010).

BBW asserts flatly that the two companies do not compete in the same market because

they sell different types of products and the products are sold in different locations.  Specifically,

BBW contends that it sells personal care products, such as body butter, body lotion, shower gel,

body wash, and fragrance mists and room sprays, Summit CSUF ¶ 128, whereas Summit sells

cosmetic products such as lip gloss and nail polish.  Id., ¶¶ 281-96.  Further, BBW argues that its

products are not sold in proximity to Summit, but rather are sold exclusively in BBW's stores

and on its website.  Id. ¶ 110.

Summit responds that its "licensed cosmetics and BBW's Twilight Woods line compete

and are sold in identical channels of commerce."  Summit Opp'n at 35.  Specifically, Summit

points out that BBW offered Summit's licensed Twilight Venom product on its website, both

parties' respective products are sold in retail stores in malls and over the internet, and BBW's

target demographic is the same demographic to which the Twilight Motion Pictures is marketed.

Id. In addition, both companies sell fragrances – BBW sells an eau de toilette product and

Summit sells the Immortal Twilight perfume.

Although the parties do not sell identical products, a reasonable jury could conclude that

the products are sufficiently similar and sold in similar locations, to a similar target of

consumers. Accordingly, this factor cuts against BBW on their motion for summary judgment.

The fifth Polaroid factor, actual consumer confusion, "is not necessary to establish a

likelihood of confusion but can often provide highly probative evidence of this likelihood."

Henegan Const. Co., Inc. v. Heneghan Contracting Corp., No. 00 Civ. 9077(JGK), 2002 WL

1300252, at *7 (S.D.N.Y. June 12, 2002). Here, both parties claim to have uncovered such

highly probative evidence in their favor.

Summit claims to have identified over 500 instances of actual consumer confusion in the

form of internet blog postings and BBW's own market research, such as:

> An internal report recapping the test produced by BBW's marketing group, in which it was observed, regarding Twilight Woods, that "[s]ome [customers] make an association to Twilight movie...may take away from sophistication of fragrance concept." Summit CSUF ¶ 344.

> A series of blog entries all under the title "Fragrances – Bath & Body Works – Twilight Woods," containing entries such as: "I was reluctant to try it because the name Twilight Woods seemed like BBW was trying to capitalize on the popularity of the Twilight books/movies." Id.

> A blog post titled "Twilight Inspired Product From [B]ath and Body Works Hits Shelves in November," stating: "I currently am an employee of Bath and Body Works and I have news about an upcoming fragrance that was inspired by Twilight." Id.

> A customer review on BBW's website that recounted how they purchased Twilight Woods based on its name and connection to the *Twilight* movie: "I hoped that it would be as wonderful as its name and it definitely is! I really only bought the trial size at first because Twilight was in the name." Id. ¶ 386.

A customer comment on BBW's website on August 11, 2010: "I received this product for Christmas because my mom thought it had something to do with the Twilight saga…" Id. ¶ 395.

BBW argues in response that in all of these instances, the speaker is merely drawing an association between the marks, questioning whether the marks are connected, or stating that BBW copied or ripped off Summit. BBW contends that as a matter of law all such statements are not evidence of actual confusion. BBW further argues that any such evidence of actual confusion constitutes mere *de minimis* evidence insufficient to raise a triable issue of fact. See Opp'n at 32.

In addition, BBW points to affirmative evidence of a lack of consumer confusion in the form of the expert report of Dr. Gerald L. Ford, which concluded that actual confusion between the two brands is negligible. Ford's report is based on an Eveready survey of 320 men and women in two controlled test cells. See Ford Report ¶¶ 9-18. Survey respondents were selected based on a quota sampling method designed to be representative of the age and gender distribution of customers of BBW stores. Potential respondents also reported that they were likely to shop at BBW within the next six months. Id. at ¶¶ 17-18. As part of the survey, respondents were shown images of BBW's products, including Twilight Woods, and were then asked a series of questions regarding their state of mind with respect to the source, authorization/approval, or business affiliation/connection of personal care products bearing the mark "Twilight Woods" and the "Twilight Woods" trade dress. BBW thus contends that Ford's findings are admissible and reliable.

In response, Summit argues that the Ford survey is flawed and untrustworthy, and therefore entitled to little or no evidentiary weight. Summit argues that the Ford survey "is fundamentally flawed and of no probative value," because, inter alia: (1) the survey was not limited to respondents who intended to purchase products in the Twilight Woods line; (2) the products shown to respondents were not representative; (3) although men were included in the

sample, they were shown the same products as women; (4) the validation of the interviews conducted did not conform to generally accepted standards for validating mall interviews; and (5) the Ford survey was improperly designed and did not contain questions that would elicit any responses focused on licensing but instead focused on retailers or manufacturers. See Opp'n at 41; Klein Decl., Ex. B. Summit does not offer its own consumer confusion survey.

The parties have thus presented conflicting evidence of actual consumer confusion, and ask the Court to draw conflicting inferences and give different degrees of weight to different pieces of that evidence. Viewing the evidence in the light most favorable to Summit, a reasonable jury could determine that this factor is only moderately favorable to BBW. Firstly, with respect to BBW's survey evidence, a reasonable juror could discount the Ford survey to some degree and find that this Polaroid factor favors BBW only weakly. Moreover, while several of the quotations collected by Summit show mere comparison rather than confusion, others plausibly indicate true actual confusion. See, e.g., Summit SUF at 395, Bost. Decl. ¶ 48, Ex. 41; S25883 ("I received this product for Christmas because my mom thought it had something to do with the Twilight saga…").

On balance, the Court thus concludes that while this Polaroid factor may favor BBW as a matter of law, the degree to which it does so depends materially on how a trier of fact views the evidence.

The sixth Polaroid factor is bad faith, which concerns "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." Lang v. Ret. Living Pub. Co., Inc., 949 F.2d 576, 583 (2d Cir. 1991). BBW claims that there is no evidence in the record that it adopted the names Twilight Woods and Twilight Crush in bad faith. BBW points to the fact that before adopting the Twilight Woods mark, BBW's outside counsel conducted a comprehensive trademark search

and issued a written opinion letter that the name was available.  BBW SUF ¶¶ 159-162.  BBW

further argues that BBW's selection of the name Twilight Woods was consistent with its prior

decision to create a woods scented theme for its new line of products.  BBW SUF ¶ 146.

Summit, however, argues that there are several facts that demonstrate bad faith.  In the

first instance, Summit contends that at the time BBW selected the Twilight mark, it was fully

aware of the *Twilight* movie and its commercial success.  Further, Summit notes that despite

BBW's significant testing of potential names for its new line of products, BBW adopted Twilight

Woods with only minimal and informal testing of the name.  Summit also argues that as early as

May 2009, prior to the product's launch, BBW became aware that customers were associating

the products with the *Twilight* Motion Pictures.  Summit SUF ¶¶ 342-44; 351-59.  According to

Summit, BBW then contacted Summit to inquire if it was interested in a co-promotion of the

Twilight Woods products and the Motion Pictures.  Id. ¶ 346.  Further, after test-launching the

Twilight Woods line, BBW became aware of additional consumer confusion.  Id. ¶ 351.

In the end, these arguments illustrate why "issues of good faith are generally ill-suited for

disposition on summary judgment."  Lang, 949 F.2d at 583 (alterations omitted).  However, for

purposes of BBW's summary judgment motion, a reasonable jury could find based on BBW's

surrounding conduct that it adopted the Twilight Woods and Twilight Crush marks with the

intent to capitalize on Summit's good will.[8]

The seventh Polaroid factor, the quality of the parties' products, is primarily concerned

with whether the inferior quality of a junior user's goods could jeopardize the senior user's

reputation.  See Arrow Fastener, 59 F.3d at 398.  However, "[p]roducts of equal quality may

[also] create confusion as to source."  Morningside, 182 F.3d at 142.  Equality of quality tends to

cause consumer confusion when the products or services are closely similar.  See Arrow Fastener

---

[8] For the reasons set forth supra, BBW's motion to preclude an award of profits based on BBW's argument that they
did not act willfully and acted in good faith is denied.  See BBW Mem. at 49.

Co., Inc. v. Stanley Works, 59 F.3d 384, 398 (2d Cir. 1995) (holding that the equal quality of pneumatic and hand held staplers is not likely to cause consumer confusion, whereas the equal quality of stitching on the back pockets of jeans is likely to create confusion as to source); Morningside, 182 F.3d at 136 (finding confusion when plaintiff and defendant both offered financial services of comparable quality to U.S. companies in relation to their acquisition of assets).

Summit has advanced no argument that BBW's products are of inferior quality to Summit's, or whether they are of similar quality and likely to create confusion as to source.  Nor is there any evidence in the record substantiating the high or low quality of BBW's products relative to those of Summit.  As a result, this factor is neutral as a matter of law.

The final Polaroid factor concerns the sophistication of the purchasers in the relevant market. The expense of the products, the manner and market conditions in which the products are purchased, and whether purchasers may be subject to impulse are relevant in determining the sophistication of the buyers.  See Gruner + Jahr, 991 F.2d at 1079; Streetwise Maps, 159 F.3d at 746; Sports Authority, 89 F.3d at 955.  Both parties have submitted limited evidence with respect to the sophistication of the consumers of their products.  However, the evidence demonstrates that at its launch, Twilight Woods products were relatively inexpensive and ranged in price from $5-$29.50, and that pre-launch trial-size versions of the products were even less expensive. Summit SUF ¶¶ 316-17.  Where the goods are inexpensive, the reasonably prudent buyer is less likely to exercise careful consideration when making purchases.  4 McCarthy § 23:96 (citation omitted).  In light of the relatively low price of BBW's products, and the lack of additional evidence in the record substantiating the sophistication of the products purchasers, this factor favors Summit.

Upon review of all of the Polaroid factors, the Court is compelled to deny BBW's motion for summary judgment. When viewing the evidence in Summit's favor, as the Court must on BBW's motion, the Court finds that one factor, actual confusion, favors granting BBW's motion for summary judgment. One factor, the quality of BBW's products, is neutral. The remaining six factors – strength of the mark, the similarity of the marks, proximity of the products, "bridging the gap," bad faith, and the sophistication of consumers – to varying degrees weigh towards denying BBW's motion. Thus, although the Polaroid analysis is not generally reducible to a mechanical counting exercise, a clear majority of factors here weigh in Summit's favor. Moreover, the Second Circuit has explained that strength, similarity, and proximity are generally the three most important Polaroid factors, and all of those three critical factors favor Summit. See Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 258 (2d Cir. 1987).

### Trademark Dilution Claims

Summit's third claim for relief is for trademark dilution under Section 43(c) of the Lanham Act and N.Y. General Business Law § 360-L.[9] "Unlike traditional infringement law, the prohibitions against trademark dilution ... are not motivated by an interest in protecting consumers." Moseley v. V. Secret Catalogue, Inc., 537 U.S. 418, 429 (2003). Dilution by blurring is an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark," 15 U.S.C. § 1125(c)(2)(B), and may be found "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1); see also Deere & Co. v. MTD Products, Inc., 41 F.3d 39, 43 (2d Cir. 1994); Nabisco, Inc. v. PF Brands, Inc., 191 F.3d

---

[9] BBW did not address Summit's trademark dilution claim under N.Y. General Business Law § 360-L in its briefs or at oral argument and only argued for dismissal pursuant to the federal statute. See, e.g., BBW Mem. at 44. Although the factors to be considered for determining dilution by blurring under New York law are similar to those under federal law, the factors are not the same. See Mobileye, Inc. v. Picitup Corp., 928 F. Supp. 2d 759, 782 (S.D.N.Y. 2013). Accordingly, the Court will only address BBW's arguments with respect to dismissal of Summit's trademark dilution claim under federal law.

208, 219 (2d Cir. 1999).  Blurring is "the whittling away of the established trademark's selling power and value through its unauthorized use by others."  Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 111 (2d Cir. 2010) (internal quotations and citations omitted).  In other words, blurring "is the loss of a trademark's ability to clearly identify one source."  Miss Universe. L.P. v. Villegas, 672 F. Supp. 2d 575, 591 (S.D.N.Y. 2009).[10]

Federal law specifies six non-exhaustive factors for the courts to consider in determining whether there is dilution by blurring: (1) the degree of similarity between the mark or trade name and the famous mark; (2) the degree of inherent or acquired distinctiveness of the famous mark; (3) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (4) the degree of recognition of the famous mark; (5) whether the user of the mark or trade name intended to create an association with the famous mark; and (6) any actual association between the mark or trade name and the famous mark.  15 U.S.C. § 1125(c)(2)(B)(i)-(vi).  In the end, a court's analysis of a blurring claim "must ultimately focus on whether an association, arising from the similarity between the subject marks, 'impairs the distinctiveness of the famous mark."  Starbucks Corp. v. Borough Coffee, Inc., 588 F.3d 97, 109 (2d Cir. 2009) (internal citation omitted).

With respect to Summit's trademark dilution claims, both parties primarily rely on the same evidence and arguments as for Summit's trademark infringement claims.  See BBW Mem. at 44-46; Summit Mem. at 47-48.  As discussed supra, a reasonable jury could find that BBW's and Summit's marks are to some degree similar.[11]  Accordingly, with respect to its federal

---

[10] Dilution by tarnishment occurs where the defendant uses the plaintiff's mark in association with unwholesome or shoddy goods or services.  See Clinique Labs., 945 F. Supp. at 562; see also Hormel, 73 F.3d at 507 ("The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use.").  Summit raised no tarnishment claim in its Opp'n or at the Hearing and there is no factual support in the record to support such a claim.

[11] BBW concedes that there is some degree of similarity between the marks, but instead argues that the similarity is "minimal."  BBW Mem. at 46.

dilution claim, this factor favors Summit on BBW's motion for summary judgment.  Similarly, for the reasons set forth supra in the Court's analysis of trademark infringement, the strength of the mark factor also favors Summit.

With respect to the third factor, Summit has not presented evidence that they are engaging in substantially exclusive use of the mark.  The undisputed evidence shows that Coty obtained a federal trademark registration for Twilight for personal care products, with a priority date of June 18, 2008.  BBW SUF ¶¶ 13-17.  This fact cuts against Summit's arguments in favor of exclusive use of the Twilight mark, particularly with respect to personal care products. Furthermore, BBW has submitted substantial evidence to demonstrate that numerous third parties are engaged in use of marks that contain the word "twilight."  For example, as of April 2012, at least 63 live federal trademark registrations, that were not owned by Summit, included the word "twilight."  BBW SUF ¶ 97; see also BBW SUF ¶¶93-96 (showing numerous book, movie, and television search results for the word "twilight" on the Amazon and IMBD websites). Summit does not provide any evidence with respect to exclusivity, but instead challenges BBW's evidence because it is not limited to the United States and is potentially over-inclusive.  See Summit SUF ¶¶ 93-96.  Therefore, this factor favors BBW.

In connection with the fourth factor, Summit has submitted several Nielsen reports establishing strong public recognition and awareness of the *Twilight* Motion Pictures.  See Summit CSUF ¶ 270.  BBW has not submitted any evidence showing the degree of recognition of Summit's marks.  A reasonable jury could conclude based on the Nielsen reports that the Summit marks are widely recognized, and this factor favors Summit.

For many of the same reasons that the bad faith factor favors Summit on the trademark infringement claim, a reasonable jury could conclude that BBW intended to associate itself with

Summit's Twilight marks.  The Court accordingly finds this factor favor Summit.  See, e.g., Starbucks, 588 F.3d at 109.

With respect to the final factor, actual association, Summit has submitted internet blog postings and BBW's internal reports that purportedly demonstrate instances of consumer confusion and association.  See supra.  Such evidence supports a potential finding of actual association between BBW's products and Summit's.  See, e.g., Virgin, 335 F.3d at 151.  In light of Summit's anecdotal evidence, and BBW's failure to proffer any evidence of non-association, the Court finds that this factor favors Summit.

In considering all of the dilution factors in this case, the Court concludes that Summit has raised triable issues of fact with regard to whether BBW's marks are likely to blur the distinctive source of Summit's Twilight marks.  As noted, a reasonable jury could find that the marks are sufficiently similar to warrant the inference that association is likely.  Further, Summit's Twilight marks are inherently distinctive, and Summit has offered evidence that suggests that its marks are of considerable renown.  Moreover, Summit has raised important issues of fact with respect to the evidence of actual association between the two marks, as well as whether BBW's marks were intended to foster associations with Summit's Twilight marks.  Accordingly, summary judgment is denied on Summit's federal dilution claim.

### Trade Dress Claims

Count Four of Summit's counterclaims asserts trade dress infringement under 15 U.S.C. § 1125(a).  A plaintiff asserting a trade dress infringement claim must demonstrate that: (1) its trade dress is either inherently distinctive or has acquired distinctiveness through secondary meaning; (2) that there is a likelihood of confusion between its trade dress and the defendant's; and (3) that the trade dress is non-functional.[12]  See Two Pesos, Inc. v. Taco Cabana, Inc., 505

---

[12] BBW does not claim that Summit's trade dress is "functional."  A product feature is only functional, and cannot serve as a trademark, "if it is essential to the use or purpose of the article or if it affects the cost or quality of the

U.S. 763, 769-70; see also Louis Vuitton Malletier v. Dooney & Bourke, Inc., ASA 454 F.3d

108, 115 (2d Cir. 2006). If a plaintiff offers no evidence of a protectable interest, a court need

not consider likelihood of confusion. See Thompson Med. Co. v. Pfizer, Inc., 753 F.2d 208, 217

(2d Cir. 1985). In addition, a Lanham Act claimant must describe its protectable interest with

some clarity – it must offer "a precise expression of the character and scope of the claimed trade

dress." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 117 (2d Cir. 2001) (citation and

quotation omitted). Inherent distinctiveness is evaluated as follows:

> [T]rade dress is classified on a spectrum of increasing distinctiveness as generic,
> descriptive, suggestive, or arbitrary/fanciful. Suggestive and arbitrary or fanciful
> trade dress are deemed inherently distinctive and thus always satisfy the first
> prong of the test for protection. A descriptive trade dress may be found inherently
> distinctive if the plaintiff establishes that its mark has acquired secondary
> meaning giving it distinctiveness to the consumer. A generic trade dress receives
> no Lanham Act protection.

Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 999-1000 (2d Cir. 1997) (citing

Two Pesos, 505 U.S. at 769-70).

With respect to distinctiveness, BBW argues that Summit's trade dress is not inherently

distinctive and has not acquired secondary meaning. BBW Mem. at 37-40. BBW claims that the

Luna Twilight product packaging "is the custom in a particular industry" and that the trade dress

"is commonplace use." Id. at 38, citing Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc., 65

F.3d 1063, 1069-70 (2d Cir. 1995) (size, shape and color of make-up compact not inherently

distinctive because features were common characteristics of cosmetics packaging). Further,

BBW claims that Summit "effectively claims to own the idea of using public domain images of

---

article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related
disadvantage." Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 165 (1995) (internal quotation marks omitted).
There is no evidence that Summit's packaging is functional. The packaging is not essential to the use of the product
itself. There are numerous variations and alternatives to the packaging and there is no evidence that Summit's
exclusive use of its packaging would put any competitors at a significant disadvantage in the market. See Christian
Louboutin S.A., 696 F.3d at 222.

trees on packaging." BBW Mem. at 38.  BBW's characterization of the evidence and the law is

inaccurate and Summit's packaging is distinctive.

In this case, Summit is not alleging trade dress rights in the Luna Twilight products

themselves, but, instead their packaging.  See Opp'n at 43.  Specifically, Summit claims to own a

protectable trade dress with respect to its line of licensed beauty products sold under the name

Luna Twilight in "a silhouette of one or more deciduous or barren trees against a contrasting or

solid background vertically lining the side of receptacles and/or packaging therefore with some

of the trees' branches extending to the opposite side of or encircling the receptacles or packaging

therefor."  Compl. Countercls. ¶ 12.  "The concept of trade dress encompasses the design and

appearance of the product together with all the elements making up the overall image that serves

to identify the product presented to the consumer."  Fun-Damental Too, Ltd., 111 F.3d at 999.

Such elements include "the appearance of labels, wrappers, and containers used in packaging a

product as well as displays and other materials used in presenting the product to prospective

purchasers."  Id.

The Second Circuit has held that product packaging is almost always inherently

distinctive, which obviates the need to prove secondary meaning.  See Paddington Corp. v. Attiki

Importers and Distributors, Inc., 996 F.2d 577, 583 (2d Cir. 1993) (Since the choices that a

producer has for packaging its products are . . . almost unlimited, typically a trade dress will be

arbitrary or fanciful and thus inherently distinctive"); Landscape Forms, Inc. v. Columbia

Cascade Co., 113 F.3d 373, 379 (2d Cir. 1997) ("this circuit appears to be moving toward a rule

that packaging is usually indicative of a product's source, while the design or configuration of

the product is usually not so.").  Summit's trade dress and packaging are adorned with a distinct

design of relatively thin, barren trees – silhouetted against a contrasting background that is

usually in hues of red, orange, pink, purple, brown or grey.  Accordingly, Summit's packaging of

the relevant products is arbitrary or fanciful and thus inherently distinctive. See Fun-Damental Too, Ltd., 111 F.3d at 1001.

With regard to likelihood of confusion, the inquiry is again determined by the Polaroid factors. When conducting a Polaroid analysis, "a court should focus on the ultimate question of whether consumers are likely to be confused." Paddington Corp., 996 at 584. In making this determination, a court looks to the totality of the product. See Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1042 (2d Cir. 1992). Although no one factor is necessarily dispositive, any one factor may prove to be so. See Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 46 (2d Cir. 2000) (finding dispositive on review of summary judgment the "similarity of marks" factor in Polaroid analysis).

With respect to the strength of its trade dress, Summit argues that its Luna Twilight products have received awards for their packaging, Summit CSUF ¶ 296, and garner further strength from the fame of the *Twilight* Motion Pictures. Further, consumers are aware of the tie between the *Twilight* novels and the Luna Twilight trade dress and Summit's promotion and marketing of the *Twilight* Motion Pictures carries over to licensed products. Summit CSUF ¶¶ 293-96. As with Summit's trademark infringement claim, this factor weighs in Summit's favor on BBW's motion for summary judgment.

As to similarity, Summit claims that Summit's trade dress and the packaging of four Twilight Woods products are similar. See Summit Opp'n at 46. As Summit notes, the products have similar names and all feature dark, relatively thin, barren branches – silhouetted against a contrasting background in similar color schemes– lining the side of the products and extending out across the products. Id. The visual similarities between Summit's trade dress and these four products is significant, and this factor favors Summit. However, Summit has offered no

evidence that any of BBW's other products are similar, and there is no evidence in the record that could support such a finding.

With respect to the third through eighth factors, the parties rely on the same evidence and arguments as for Summit's trademark infringement claims. For the reasons set forth supra with respect to Summit's trademark infringement claims, as well as the additional findings noted above, the Court finds that six of the Polaroid factors to varying degrees weigh towards denying BBW's motion.

### Cancellation Claims

BBW also moves for summary judgment dismissal of Summit's cancellation claim. See Opp'n at 47; Third Am. Countercls. ¶¶ 78-79. With respect to the Twilight Crush mark, Summit raises two grounds for cancellation: abandonment and fraud. "To determine that a trademark or trade name is abandoned, two elements must be satisfied: non-use of the name by the legal owner and no intent by that person or entity to resume use in the reasonably foreseeable future." Stetson v. Howard D. Wolf & Assoc., 955 F.2d 847, 850 (2d Cir. 1992). 15 U.S.C. § 1127 expressly provides that intent not to resume "may be inferred from the circumstances" and there is a presumption of abandonment if the mark has not been used for three years. See ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 148 (2d Cir. 2007).

Summit argues that BBW admits that it is not currently using the Twilight Crush mark, and that BBW has not presented any evidence it intends to resume use of the mark. See I.H.T. Corp. v. Saffir Pub. Corp., 444 F. Supp. 185, 189 (S.D.N.Y. 1978) (intent may be inferred from a party's actions or lack thereof). Summit also contends that BBW's last and only use of the Twilight Crush mark was more than three years ago. See Opp'n at 49.

BBW does not dispute that it no longer sells any products bearing the Twilight Crush mark, CSUF ¶ 404, but instead argues that there is no evidence that BBW does not intend to

resume using the Twilight Crush mark. BBW has provided no evidence to support such an inference, and instead relies on the fact that BBW has re-used other marks in the past. See BBW Mem. at 47. In the absence of any affirmative evidence that BBW intends to resume use of its Twilight Crush mark, and BBW's admission that the mark is no longer in use, a reasonable trier of fact could conclude that the mark has been abandoned. Cf. Baglin v. Cusenier Co., 31 S.Ct. 669, 674 (1911) ("Acts which, unexplained, would be sufficient to establish an abandonment, may be answered by showing that there never was an intention to give up and relinquish the right claimed."). Accordingly, summary judgment is inappropriate.

## Conclusion

BBW's motion for summary judgment is DENIED.

Dated:  March 21, 2014
        New York, New York

SO ORDERED

GEORGE B. DANIELS
United States District Judge